**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **JOHNNY FULLER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 3:21-cv-03197-X** |
| **OWENS CORNING INSULATING** | § | |
| **SYSTEMS, LLC** | § | |
| | § | |
| **Defendant.** | | |

---

**PLAINTIFF'S BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

*/s/ Megan Dixon*
**Megan Dixon**
State Bar No. 24079901
mdixon@clousebrown.com

**CLOUSE BROWN, PLLC**
1201 Elm St., Ste. 5250
Dallas, Texas 75270
Tel:  (214) 698-5100
Fax:  (214) 481-8881

**ATTORNEY FOR PLAINTIFF**

## TABLE OF CONTENTS

I.  STATEMENT OF THE FACTS ................................................................................1

    A.  Fuller was a loyal employee of 24 years before his wrongful termination..............1

    B.  Fuller's 2019 accommodation request and Owens Corning's negative treatment ....................................................................................... 2-3

    C.  Owens Corning disciplined Fuller for reporting safety issues in January 2020 .. 3-4

    D.  Fuller reported feeling pain in his abdomen while working on April 8, 2020..... 4-7

    E.  Fuller was diagnosed with a hernia by a medical doctor for the first time .......... 7-8

    F.  Owens Corning failed to accommodate Fuller's medical restrictions ....................8

    G.  Owens Corning's "investigation" ................................................................... 8-11

    H.  Gallagher Bassett denied Fuller's workers' compensation claim based on Owens Corning's investigation ..................................................................... 8-12

    I.  Fuller had surgery to repair his hernia and his doctor discovered a second hernia.......................................................................................... 8-12

    J.  Fuller was released to return to work without restrictions, but Owens Corning failed to placed him back to his machine operator position..................................13

    K.  Owens Corning continued its "investigation"................................................ 13-14

    L.  Owens Corning reviewed Fuller's medical records and could not find any evidence of a prior diagnosis of a hernia but continued to keep Fuller on a leave of absence ....................................................................................14

    M.  Fuller provided additional doctor's notes ...........................................................14

    N.  Owens Corning terminated Fuller for falsifying an injury report.........................14

    O.  Owens Corning has expressed a negative attitude towards workplace injuries...................................................................................... 15-16

    P.  Owens Corning incentivizes reducing the number of workplace injuries and boasts that it has reduced the number of reportable injuries by 90% since 2002 ..14

    Q.  Fuller appealed the denial of his workers' compensation claim...........................17

II.      ARGUMENTS AND AUTHORITIES ................................................................. 18-30

    A.  Owens Corning violated the ADA and the TCHRA ...............................................18

        1.  Disability Discrimination ..................................................................................18

        2.  Failure to Accommodate ...................................................................................22

    B.  Owens Corning violated the FMLA the FMLA ....................................................18

        1.  Interference FMLA Claim .................................................................................24

        2.  Retaliation FMLA Claims .................................................................................25

    C.  Owens Corning violated the Texas Workers Compensation Act ("TWCA") .......26

    D.  Owens Corning's collateral estoppel claim is a red herring ................................29

III.     CONCLUSION & PRAYER .......................................................................................30

# TABLE OF AUTHORITIES

Cases        Page(s)

*Allen v. Rapides Parish Sch. Bd.*,
204 F.3d 619 (5th Cir. 2000) ...........................................................22

*Beck v. Univ. of Wisc. Bd. of Regents*,
75 F.3d 1130 (7th Cir.1996) ...........................................................23

*Bradberry v. Jefferson County*,
732 F.3d 540 (5th Cir. 2013) ...........................................................29

*Busken v. City of Greenville, Tex.*
No. 3:19-CV-02808-X [Doc. 32] (N.D. Tex.  Nov. 3, 2021) .........................21, 23, 24, 25

*Campbell v. Gambro Healthcare, Inc.*,
478 F.3d 1282 (10th Cir.2007); ...........................................................24

*Cannon v. Jacobs Field Servs. N. Am., Inc.*,
813 F.3d 586 (5th Cir. 2016) ...........................................................19

*Cleveland v. Policy Mgmt. Sys. Corp.*,
526 U.S. 795 (1999)...........................................................18

*Click v. Copeland,*
970 F.2d 106 (5th Cir. 1992) ...........................................................20

*Continental Coffee Prods. Co. v. Cazarez.*,
937 S.W.2d 444 (Tex. 1996)...........................................................26, 27

*Copeland v. Merrill Lynch & Co., Inc.*,
47 F.3d 1415, 1421 (5th Cir.1995). ...........................................................26, 27

*Cutrera v. Bd of Sup. of La. State Univ.*,
429 F.3d 108 (5th Cir. 2005) ...........................................................23

*Duhon v. Bone & Joint Physical Therapy Clinics.*,
947 S.W.2d 316 (Tex. App. – Beaumont 1997); ...........................................................26

*Forsyth v. City of Dall.,*
91 F.3d 769 (5th Cir. 1996) ...........................................................20

*Green v. Lowe's Home Centers, Inc.*,
199 S.W.3d 514 (Tex. App. – Houston [1st Dist.], 2000).  ...........................................................27

iv

*Herrnreiter v. Chicago Hous. Auth.*,
　315 F.3d 742 (7th Cir. 2002) ........................................................20

*Hunt v. Rapides Healthcare Sys., LLC*,
　277 F.3d 757 (5th Cir. 2001) ........................................................20

*Jackson v. Cal-W. Packaging Corp.*,
　602 F.3d 374 (5th Cir. 2010) ........................................................19

*Jenkins v. Cleco Power, LLC*,
　487 F.3d 309 (5th Cir. 2007) ........................................................18

*Johnson v. City of Houston*,,
　203 S.W.3d 7 (Tex. App.—Houston [14th Dist.] 2006, pet. denied................................27

*Laxton v. Gap Inc*
　333 F.3d 572 (5th Cir. 2003) ........................................................25

*McArdle v. Dell Products, LP*,
　293 Fed. Appx. 331 (5th Cir. 2008)........................................................25

*McCoy-Winston v. UPS, Inc*,
　2022 WL 782575 at *7 (March 15, 2022 W.D. Wash)........................................25

*McDonnell Douglas Corp. v. Green*,
　411 U.S. 792 (1973)........................................................18

*Parker v. Valerus Compression Servs., LP*,,
　365 S.W.3d 61 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).........................18, 20

*Pegram v. Honeywell, Inc.*,
　361 F.3d 272 (5th Cir. 2004) ........................................................18, 20

*Picard v. St. Tammany Parish Hospital*,
　611 F.Supp. 2d 608 (E.D. La. 2009)........................................................18

*Reeves v. Sanderson Plumbing Prods., Inc.*,
　530 U.S. 133 (2000)........................................................22

*Rizzo v. Children's World Learning Ctrs., Inc.*,
　213 F.3d 209, 213 & n. 5 (5th Cir.2000) ........................................................23

*Rodriguez v. Eli Lilly & Co.*,
　820 F.3d 759 (5th Cir. 2016) ........................................................18

*San Antonio Water System v. Nicholas*,

461 S.W.3d 131 (Tex. 2015) ........................................................................18

*Seaman v. CSPH, Inc.*,
179 F.3d 297 (5th Cir. 1999) ......................................................................18

*Sharp v. City of Hous.*,
164 F.3d 923 (5th Cir. 1999) ......................................................................20

*Smith v. E. Baton Rouge Parish Sch. Bd.*,
453 F.3d 650 (5th Cir.2006) .......................................................................18

*Stephens v. Neighborhood Serv. Org.*,
2008 WL 3913926 (E.D. Mich. Aug. 19, 2008). ) .........................................18

*Swanson v. Gen. Servs. Admin.*,
110 F.3d 1180, 1188 (5th Cir. 1997 ...........................................................23

*Taylor v. Phoenixville Sch. Dist.*,
184 F.3d 296 (3d Cir.1999) ........................................................................23

*Thompson v. City of Waco*,
764 F.3d 500 (5th Cir. 2014) ......................................................................19

*Thornbrough v. Columbus & Greenvile R.R. Co.*,
760 F. 2d 633 (5th Cir. 1988) .....................................................................19

*Vance v. Ball State Univ.*,
133 S. Ct. 2434 (2013) ...............................................................................19

**Other Statutes and Authorities**                                    **Page(s**

TEX. LABOR CODE § 451.001 .........................................................................26

29 C.F.R. § 825.220 ....................................................................................24

29 C.F.R. § 1630.2 ......................................................................................22

29 U.S.C. § 2614 .........................................................................................24

42 U.S.C. § 12111 .......................................................................................22

18 Wright, Miller & Cooper, Federal Practice and Procedure § 4417 .........29

**Websites:**

Leave, *Job Accommodation Network*, *https://askjan.org/topics/leave.cfm* (last visited November 7, 2022) .................................................................................................................................23

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **JOHNNY FULLER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 3:21-cv-03197-X** |
| **OWENS CORNING INSULATING** | § | |
| **SYSTEMS, LLC** | § | |
| | § | |
| **Defendant.** | § | |

---

**PLAINTIFF'S BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Johnny Fuller ("Plaintiff" or "Fuller") files this Brief in Support of Plaintiff's Response to Defendant Owens Corning Insulating Systems, LLC's ("Owens Corning") Motion for Summary Judgment.

## I.   STATEMENT OF THE FACTS

### A.  Fuller was a loyal employee of 24 years before his wrongful termination.

Fuller began working at Owens Corning's Waxahachie plant on September 22, 1997, where he worked for approximately 24 years before his termination.[1]  Owens Corning manufactures fiberglass insulation at its Waxahachie plant.[2] At the time of his termination, Fuller was a machine operator making about $25 per hour plus overtime.[3]

As a machine operator, Fuller typically worked 12-hour shifts either 7am to 7pm or 7pm to 7am.[4] Prior to being a machine operator, Fuller was a Safety Advocate making approximately

---

[1] Fuller Dec. ¶ 1, 29, (App. 0001, 0007).
[2] Fuller Dec. ¶ 3, (App. 0001).
[3] Fuller Dec. ¶ 3, (App. 0001).
[4] Fuller Dec. ¶ 3, (App. 0001).

1

$28 an hour.[5] He started this position in approximately July 2018.[6] Before becoming a Safety Advocate in July 2018, he was a machine operator.[7] During his employment, Fuller elected various benefits offered by Owens Corning, including medical benefits and short term/long term disability benefits.[8]

### B. Fuller's 2019 accommodation request and Owens Corning's negative treatment.

In October 2019, Fuller submitted an accommodation request to Owens Corning, requesting to not work around formaldehyde.[9] This restriction was due to respiratory issues dating back to approximately 2001.[10] Specifically, in 2001, Fuller had sinus surgery and was given restrictions to not work around formaldehyde.[11] Prior to the request in 2019, Fuller submitted similar accommodation requests to Owens Corning without issue.[12] For example, Fuller submitted a doctor's note in December 2017 stating that he should "avoid exposure to formaldehyde, for medical reasons."[13] There were no issues accommodating this request at that time.[14]

Fuller's October 2019 request was different. First, a few weeks after requesting his formaldehyde restrictions in October 2019, Owens Corning demoted Fuller from his position as a Safety Advocate back to a machine operator, and he returned to the production floor on or about November 11, 2019.[15] As a result, his hourly rate was decreased from $28 an hour to approximately $25 per hour.[16]

---

[5] Fuller Dec. ¶ 4, (App. 0001).
[6] Fuller Dec. ¶ 4, (App. 0001).
[7] Fuller Dec. ¶ 4, (App. 0001).
[8] Fuller Dec. ¶ 1, (App. 0001).
[9] Fuller Dec. ¶ 5, (App. 0001).
[10] Fuller Dec. ¶ 5, (App. 0001).
[11] Fuller Dec. ¶ 5, (App. 0001).
[12] Fuller Dec. ¶ 5, (App. 0001).
[13] Fuller Dec. ¶ 5, Ex. A, (App. 0001, 0010).
[14] Fuller Dec. ¶ 5, (App. 0001).
[15] Fuller Dec. ¶ 6, (App. 0002).
[16] Fuller Dec. ¶ 6, (App. 0002)..

Secondly, Owens Corning only temporarily accommodated his restrictions until November 20, 2019.[17] At that time, Fuller was not allowed to work and was be placed on a leave of absence.[18] Fuller expressed that he was very concerned about being placed out of work on short term disability leave because he would not be receiving his full pay, including overtime pay or holiday pay.[19] Instead of accommodating his restrictions in a manner that allowed him to work, Fuller was placed out of work from approximately November 20, 2019 to December 2, 2019.[20] Fuller had to utilize his short-term disability benefits in order to be paid during this time period which reduced his take-home pay.[21]

### C. Owens Corning disciplined Fuller for reporting safety issues in January 2020.

On January 14, 2020, Fuller noticed three safety issues while working.[22] According to Owens Corning's policies, he was required to **either** report the issue to his supervisor **or** initiate a work order if he discovered safety issues, including any machine guarding that had been compromised, removed, or damaged.[23] Specifically, the Waxahachie Plant Safety & Health Program policy on machine guarding in place at that time describes exactly what employees are required to do upon discovering issues with machine guarding.[24] Fuller followed Owens Corning's policies by taking pictures of each issue, creating a work order to repair the issues, and issuing Safety Awareness Bulletins for each one.[25] The Safety Awareness Bulletins were emailed and

---

[17] Fuller Dec. ¶ 7, (App. 0002).
[18] Fuller Dec. ¶ 7, (App. 0002).
[19] Fuller Dec. ¶ 7, (App. 0002).
[20] Fuller Dec. ¶ 7, (App. 0002).
[21] Fuller Dec. ¶ 7, (App. 0002).
[22] Fuller Dec. ¶ 8, (App. 0002).
[23] Fuller Dec. ¶ 8, (App. 0002).
[24] Fuller Dec. ¶ 8, Ex. B, (App. 0002, 0011-0015).
[25] Fuller Dec. ¶ 8, Ex. C, (App. 0002, 0016-0018).

distributed to all employees on Owens Corning distribution list.[26] According to the policy, it is the Technical Lead's responsibility to reduce the risk related to hazardous equipment.[27]

On or about January 17, 2020, Owens Corning suspended Fuller pending an investigation, alleging that he identified three safety hazards and failed to mitigate them.[28] During the investigation by his supervisor, Fuller stated that he took action to eliminate the risks by creating a work order and issuing the safety alerts.[29]  He also stated, ***"this is why no one reports anything, you try to do the right thing and bring awareness to a risk and get in trouble for it."***[30] Fuller followed Owens Corning safety policies to obtain the appropriate repairs by placing a work order so that the problem could not be covered up.  But as a result of reporting these safety issues, Fuller was disciplined and suspended for one week.[31]

### D.  Fuller reported feeling pain in his abdomen while working on April 8, 2020.

On April 8, 2020, Fuller was working a 7pm to 7am shift on the V3 line.[32] Owens Corning was shorthanded that night and only had one machine operator for each line.[33]  Marion Andrews asked Fuller to leave his line unattended to go load insulation paper on the V2 line to prepare for the next shift.[34] Shortly after midnight, Fuller left his line and went to load the paper by himself on the V2 line as instructed.[35]

---

[26] Fuller Dec. ¶ 8, (App. 0002).
[27] Fuller Dec. ¶ 8, (App. 0002).
[28] Fuller Dec. ¶ 9, (App. 0003).
[29] Fuller Dec. ¶ 9, (App. 0003).
[30] Fuller Dec. ¶ 9, (App. 0003).
[31] Fuller Dec. ¶ 9, (App. 0003).
[32] Fuller Dec. ¶ 10, (App. 0003).
[33] Fuller Dec. ¶ 10, (App. 0003).
[34] Fuller Dec. ¶ 10, (App. 0003).
[35] Fuller Dec. ¶ 10, (App. 0003).

Fuller loaded a stub roll (or partial roll) first.[36] The stub roll weighed approximately 125 pounds.[37] In order to load the stub roll, Fuller had to insert a shaft or bar into the roll, bend down, and lift each end to place the bar in the cradle of the machine.[38] When he loaded the second end of the stub roll, Fuller felt pain his stomach that felt like a muscle pull or a strain.[39] Fuller described the pain as being a quick pain that lasted a few seconds and then subsided, like dropping something on your foot.[40] Fuller ignored the pain, and he continued working.[41]

After loading the stub roll, Fuller loaded the full roll, which was approximately 600-800 pounds.[42] After loading the full roll, he continued to feel pain in his stomach.[43] Fuller described the pain as feeling like having a sore thumb that hurts when you use it.[44] Fuller stopped loading the rolls, and he noticed the swelling of a knot above his abdomen.[45]

Owens Corning requires employees to report any injuries, no matter how minor.[46] That same night, Fuller went to his supervisor's office to report that he felt pain in his stomach after lifting the roll.[47]  His supervisor asked if Fuller needed to go to the hospital, but Fuller told him that he did not need to go to the hospital because he did not believe it was urgent enough to go, especially during the COVID-19 pandemic.[48] Fuller was off work for the next two days, so he planned to take it easy, take some medicine, and rest. Denbow created an I-4 injury report regarding Fuller's injury, which stated:

---

[36] Fuller Dec. ¶ 11, (App. 0003).
[37] Fuller Dec. ¶ 11, (App. 0003).
[38] Fuller Dec. ¶ 11, (App. 0003).
[39] Fuller Dec. ¶ 11, (App. 0003).
[40] Fuller Dec. ¶ 11, (App. 0003).
[41] Fuller Dec. ¶ 11, (App. 0003).
[42] Fuller Dec. ¶ 12, (App. 0003).
[43] Fuller Dec. ¶ 12, (App. 0003).
[44] Fuller Dec. ¶ 12, (App. 0003).
[45] Fuller Dec. ¶ 12, (App. 0003).
[46] Williamson Depo., p. 37, (App. 0041); Fuller Dec. ¶ 13, (App. 0004).
[47] Fuller Dec. ¶ 13, (App. 0004).
[48] Fuller Dec. ¶ 13, (App. 0004).

> EE was working in the V2 pit setting up to run paper. EE was at the west center stand and was loading a stub roll. On the stand the cradle would not go all the way down so EE lifted the stub roll to load it into the cradles. When EE did this there was a muscle pull/strain feeling in the stomach area. EE finished setting up that lane then pit a new roll on another stand this is when EE felt the peak of the pain. EE reported the injury, but declined to go to the ER or be checked out.[49]

On April 9, 2020, on his day off, Ann DeValerio – the head of the safety department – called Fuller.[50] Fuller explained that he had pain from his navel to his groin and there was swelling of a bump above his navel.[51] DeValerio told Fuller that he needed to get medical care if the pain persisted.[52] Fuller returned to work on April 11, 2020. The pain in his abdomen was not getting worse, but it was not getting any better.[53] Fuller worked his shift on April 11 and April 12, 2020.[54]

On April 13, 2020, Fuller contacted the on-site nurse, Tiffany Goodson, because he was still experiencing pain.[55] Goodson was a new plant nurse; she had only been working at Owens Corning for approximately two months before Fuller's injury.[56] Rather than examine Fuller in her office, Goodson put on her steel-toed boots, put in her earplugs, and met Fuller in the V2 pit.[57] According to Goodson, this was not a quiet, private meeting; it was very loud with people coming in and out of doors, alarms going off, and walkie-talkies going off.[58] During this meeting, Fuller told Goodson that felt pain on April 8, 2020 while lifting a stub roll.[59] He told her that the pain was new and that he noticed the knot in his stomach was swelling.[60] According to Goodson, she

---

[49] Injury Incident Report, (App. 0158).
[50] Fuller Dec. ¶ 14, (App. 0004).
[51] Fuller Dec. ¶ 14, (App. 0004).
[52] Fuller Dec. ¶ 14, (App. 0004).
[53] Fuller Dec. ¶ 15, (App. 0004).
[54] Fuller Dec. ¶ 15, (App. 0004).
[55] Fuller Dec. ¶ 16, (App. 0004).
[56] Goodson Depo., p. 8-9, (App. 0100-0101).
[57] Goodson Depo., p. 36-37, (App. 0122-123).
[58] Goodson Depo., p. 96, (App. 124).
[59] Fuller Dec. ¶ 16, (App. 0004).
[60] Fuller Dec. ¶ 16, (App. 0004).

saw the bulge in Fuller's stomach and asked if it was the pull he was referring to. Fuller, said "yes, it is new", but Goodson did not know if he was referring to the bulge or the pull.[61] Goodson assumed he was referring to the bulge.[62] Fuller did not have someone to cover his position so he could not leave to seek medical treatment at that time.[63] Later in the afternoon, Fuller went to Goodson's office to pick up his paperwork so he could go to Nova Medical for treatment.[64]

### E.  Fuller was diagnosed with a hernia by a medical doctor for the first time.

Fuller went to Nova Medical and told the doctor that he felt pain in his abdomen and that he noticed the swelling of a knot in his stomach.[65] The doctor diagnosed him with a hernia.[66] Prior to this diagnosis, Fuller had never been diagnosed with a hernia by any medical doctor or received treatment for a hernia by any medical professional.[67]

Fuller did have a bulge above his belly button prior to this diagnosis.[68] It was only visible at times, and it had never bothered Fuller before and had never caused any pain.[69] Fuller does not know when the bulge started.[70] After feeling pain in his stomach on April 8, 2020, Fuller never told anyone that the bulge was new.[71] He told everyone the pain was new and the knot was swelling.[72]

---

[61] Goodson Depo., 96-97, (App. 0124-0125).
[62] Goodson Depo., p. 96-97, (App. 0124-0125).
[63] Fuller Dec. ¶ 17, (App. 0004).
[64] Fuller Dec. ¶ 17, (App. 0004).
[65] Fuller Dec. ¶ 18, (App. 0004).
[66] Fuller Dec. ¶ 18, (App. 0004).
[67] Fuller Dec. ¶ 18, (App. 0004).
[68] Fuller Dec. ¶ 19, (App. 0004-0005).
[69] Fuller Dec. ¶ 19, (App. 0004-0005).
[70] Fuller Dec. ¶ 19, (App. 0004-0005).
[71] Fuller Dec. ¶ 19, (App. 0004-0005).
[72] Fuller Dec. ¶ 19, (App. 0004-0005).

### F. Owens Corning failed to accommodate Fuller's medical restrictions.

After his hernia diagnosis from Nova Medical, Fuller was released to return to work with restrictions.[73] Rather than accommodate his restrictions, Fuller was told that Owens Corning could not accommodate his restriction, and he would be placed on a leave of absence.[74] At the time, there were other light duty jobs at Owens Corning that Fuller could have performed. First, the paperwork signed by Nurse Goodson and submitted to Nova Medical plainly checks that "**LIGHT DUTY IS AVAILABLE**."[75] Second, other individuals had been given light duty in the past. For example, another co-worker had a hurt back and Owens Corning gave him light duty work by taking reports and doing paperwork.[76] Another employee broke his arm and Owens Corning provided him similar light duty work.[77]  Based on his restrictions, Fuller could have performed these tasks.

After denying his request to accommodate his restrictions, Owens Corning placed Fuller on a leave of absence.[78] Fuller utilized his short-term disability benefits to receive payment during this time, where he received payments of $670.95 per week.[79] Prior to this, Fuller was earning an average of approximately $1500 per week. This leave was also designated as FMLA leave.[80]

### G. Owens Corning's "investigation."

After Fuller's injury report, the safety department began a root cause investigation.[81] The safety department consists of safety leader Oscar Ortinez and safety specialist Ann DeValerio.[82] The purpose of the root cause analysis is to find out what can be prevented in the future.[83] However,

---

[73] Fuller Dec. ¶ 20, Ex. D, (App. 0005, 0019).
[74] Fuller Dec. ¶ 20, (App. 0005).
[75] Nova Authorization for Examination, (App. 0162).
[76] Fuller Dec. ¶ 21, (App. 0005).
[77] Fuller Dec. ¶ 21, (App. 0005).
[78] Fuller Dec. ¶ 22, (App. 0005).
[79] Fuller Dec. ¶ 22, (App. 0005).
[80] Fuller Dec. ¶ 22, (App. 0005); 2020 paystubs, (App. 0163-0214).
[81] Williamson Depo., p. 42-45, (App. 0045-48).
[82] Williamson Depo., p. 75, (App. 0050).
[83] Williamson Depo., p. 42-45, (App. 0045-48).

the investigation into Fuller's injury was not focused on the root cause; rather, it was focused on proving Fuller was not injured while at work.

Williamson reviewed video footage of Fuller performing the work at the time of his injury.[84] The cameras in the facility do not record audio.[85] Based on a review of the video, Williamson concluded the following:

- There was no visible sign of injury or reaction - I could not see any point where he reacted to pain or an injury when loading these rolls. He also didn't seem to respond when he felt 'peak pain' (according to the safety alert) when loading the larger roll.

- He did not fully pick up the weight of the roll, he picked up one end of the shaft and placed it on the hoist hook, then the other end. That means the weight he picked up was much less than the total weight of the roll and shaft.

- If he did injure himself on the stub roll, he didn't appear to be injured at all when moving the full sized roll into place, which was 20 minutes later according to the timestamp. Pushing and turning the roll, and using your buttocks to bump the roll over aren't movements I think you would do if you just herniated yourself, but he shows no sign of injury when doing this task.

- Doesn't appear to be any interruption in his work due to the injury – in the 20 minute gap between the videos it appears that he raised the stub roll to the top cradle on the paper stand, dressed it, and spliced it to the paper that was already threaded for that lane.

- There was apparently help available, another EE was in the area and you can see him come through cleaning up at the end of the second video.[86]

Williamson further stated, "I am not disputing that he may have a hernia, but it may not have occurred in the time or manner it was reported."[87]

The first video is one minute and forty-five seconds, and there is a sheet of paper covering Fuller for a majority of the time and his back is turned toward the camera.[88] Right after Fuller

---

[84] Williasmon Depo., p. 103-104, (App. 0051-0052).
[85] Williamson Depo., p. 104, 110, (App. 0052, 0058).
[86] Williamson Depo., p. 106, Ex. 14, (App. 0054, 0084).
[87] Williamson Depo., p. 106, Ex. 14, (App. 0054, 0084).
[88] Williamson Depo., p. 109-111, Ex. 15, (App. 0059, Manual Filing).

drops the bar in the cradle, he goes behind the paper screen.[89] Williamson admitted that he could not tell from the video if Fuller was on his knees, if he had tears in his eyes, or if he was screaming for help after he went behind the screen.[90]

The second video, which is approximately twenty-five minutes later, has the same sheet of paper obstructing the view of Fuller and has no sound.[91] Williamson testified that he saw Fuller drop his head down, change his stance, and walk towards the door.[92] However, this was not enough for Williamson because he concluded there were no visible signs of Fuller exhibiting any pain.[93] Williamson has never had a hernia and does not know what one feels like.[94] He is not a medical professional, and he has never asked a medical professional about the pain levels of a hernia.[95]

Williamson began searching for old photos of Fuller allegedly dating back to 2016 where he had noticed a similar bulge in Fuller's abdomen.[96] No one at Owens Corning, including Williamson, asked Fuller about the photos.[97] If anyone would have asked questions, Fuller would have explained, again, that the bulge was not new, but the pain was new.[98]

Safety lead Oscar Ortinez asked Nurse Goodson to violate HIPAA and give him Fuller's protected medical records because he wanted to find something that to prove that Fuller had a preexisting condition.[99] Goodson refused and was verbally reprimanded by Ortinez;[100]

---

[89] Williamson Depo., p. 112, (App. 0060).
[90] Williamson Depo., p. 112, (App. 0060).
[91] Williamson Depo., p. 114-116, Ex. 16, (App. 0062-0064, Manual Filing).
[92] Williamson Depo., p. 114-116, (App. 0062-0064).
[93] Williamson Depo., p. 115, (App. 0063).
[94] Williamson Depo., p. 119-120, (App. 0065-0066).
[95] Williamson Depo., p. 119-120, (App. 0065-0066).
[96] Williamson Dec. ECF 28-6, ¶ 7.
[97] Fuller Dec. ¶ 24, (App. 0005-0006).
[98] Fuller Dec. ¶ 24, (App. 0005-0006).
[99] Goodson Depo., p. 30, (App. 0116).
[100] Goodson Depo., p. 16-25, 29-32, 34-35, (App. 0102-0111,0115-0121).

On April 16, 2020, Fuller met with DeValerio, Goodson, Ortinez, Denbow, Williamson, and a few other Owens Corning employees.[101] Williamson took notes during this meeting.[102] Fuller explained what happened and answered all of their questions.[103] Nick Conklin asked if it was a "take you to your knees type of pain" and Fuller hesitantly replied, "well, yes" before clarifying that it was like you drop something on your foot or smash your toe, that "it hurts, and a few seconds later the pain subsided."[104] Fuller continued to explain that it was not excruciating pain, but it was uncomfortable.[105] They watched the first video with Fuller, and he pointed out that he had already felt the pain when he was trying to get the stub roll positioned in.[106] They watched the second video, and he pointed out, "this is where I really felt it hurt a lot, trying to get this one positioned into the center stand."[107] No one asked Fuller any questions about the photographs showing a pre-existing bulge during this meeting.[108]

After Fuller left the meeting, there was a discussion between operations, safety leadership about this potentially being an attempt to commit workers' comp fraud, but Williamson conveniently and intentionally decided not to include those discussions in his notes.[109] There was a discussion about his account of what happened not matching up with the video, and that Fuller allegedly had difficulty showing them where the injury occurred.[110] During his deposition, Williamson had a difficult time showing any false statements made by Fuller during this meeting.[111]

---

[101] Williamson Depo., p. 124, Ex. 17, (App. 0067, 0086-0094).
[102] Williamson Depo., p. 124, Ex. 17, (App. 0067, 0086-0094).
[103] Williamson Depo., Ex. 17, (App. 0067, 0086-0094).
[104] Williamson Depo., Ex. 17, (App. 0067, 0086-0094).
[105] Williamson Depo., Ex. 17, (App. 0067, 0086-0094).
[106] Williamson Depo., Ex. 17, (App. 0067, 0086-0094).
[107] Williamson Depo., Ex. 17, (App. 0067, 0086-0094).
[108] Williamson Depo., Ex. 17, (App. 0067, 0086-0094).
[109] Williamson Depo., p. 124-125, (App. 0067-0068).
[110] Williamson Depo., p. 126-130, (App. 0069-0073).
[111] Williamson Depo., p. 127-131, (App. 0070-0074).

**H. Gallagher Basset denied Fuller's workers' compensation claim based on Owens Corning's investigation.**

On or about April 27, 2020, Fuller received a letter stating that his workers compensation claim was being denied by the insurance carrier.[112] The letter stated that the carrier disputed the date of injury because the bulge seen by the plant nurse was the same bulge in a picture from July 2019.[113] Prior to this, no one had asked Fuller any questions about the photographs.[114]

Furthermore, Owens Corning completed a Letter of Non-Recordability and designating Fullers injury as "non-recordable" under OSHA regulation.[115] The comments stated that "there is video of Johnny performing this task and the video evidence supports that he was not injured loading rolls onto the paper payout stand. Worker's Comp has denied his claim based on our investigation."[116]

**I. Fuller had surgery to repair his hernia and his doctor discovered a second hernia.**

After his workers compensation claim was denied, Fuller met with a surgeon, Dr. Mazen Iskander, to get his hernia repaired using his medical insurance.[117] Fuller did not have to rely upon workers compensation to get treatment for his condition. Fuller told Dr. Iskandar that he felt sharp pain when he lifted the heavy stub roll a few weeks prior on April 8, 2020. He also told Dr. Iskander that the bulge did not start that day at work.[118] On June 12, 2020, Fuller had the surgery to repair his hernia.[119] After his surgery, Dr. Iskander explained that he discovered two hernias while he was performing the surgery.[120]

---

[112] Fuller Dec. ¶ 24, (App. 0005-0006).
[113] Fuller Dec. ¶ 24, (App. 0005-0006).
[114] Fuller Dec. ¶ 24, (App. 0005-0006).
[115] Williamson Depo., Ex. 18, (App. 0095).
[116] Williamson Depo., Ex. 18, (App. 0095).
[117] Fuller Dec. ¶ 25, (App. 0006).
[118] Fuller Dec. ¶ 25, (App. 0006).
[119] Fuller Dec. ¶ 25, (App. 0006).
[120] Fuller Dec. ¶ 25, Ex. F, (App. 0006, 0021).

**J. Fuller was released to return to work without restrictions, but Owens Corning failed to place him back to his machine operator position.**

On July 20, 2020, Fuller was released to work without restrictions, but Owens Corning would not allow him to return to his machine operator position.[121] Instead, he was placed on a paid leave of absence.[122] This paid leave of absence reduced Fuller's compensation because he was not able to work and be paid all overtime.[123]

**K. Owens Corning continued its "investigation".**

Shortly after being released to return to work and being placed on a leave of absence, Fuller was asked to come in to meet with Williamson and Oliver from human resources.[124] They asked additional questions about his April 8, 2020 injury, and Fuller told them again that he had never felt pain like that before.[125] For the first time, they asked Fuller when he developed the bulge in his stomach, and Fuller told them that he did not know how long the bulge had been there because it never bothered him before.[126] Fuller told Williamson and Oliver that he did not tell anyone that he had a pre-existing hernia because he did not know that he had one; he had never been diagnosed or treated for a hernia before.[127]

Williamson and Oliver stated that they were investigating Fuller's injury because he made statements to the workers compensation insurance carrier that conflicted with statements he made during the original safety investigation on April 16, 2020.[128] Fuller told them that he did not recall saying anything different to anybody and asked what the conflicting statements were.[129]

---

[121] Fuller Dec. ¶ 25, (App. 0006).
[122] Fuller Dec. ¶ 25, (App. 0006).
[123] Fuller Dec. ¶ 25, (App. 0006).
[124] Fuller Dec. ¶ 26, (App. 0006).
[125] Fuller Dec. ¶ 26, (App. 0006).
[126] Fuller Dec. ¶ 26, (App. 0006).
[127] Fuller Dec. ¶ 26, (App. 0006).
[128] Fuller Dec. ¶ 26, (App. 0006).
[129] Fuller Dec. ¶ 26, (App. 0006).

Williamson and Oliver could not tell Fuller what those conflicting statements were.[130] Oliver asked why Fuller did not appeal the workers compensation denial, and Fuller told him that he still had to get the hernia fixed regardless of the insurance company denying the claim, so he went to his doctor to get it fixed.[131] Fuller also told Oliver that his doctor found two hernias during the surgery.[132]

**L.  Owens Corning reviewed Fuller's medical records and could not find any evidence of a prior diagnosis of a hernia but continued to keep Fuller on a leave of absence.**

During the investigation, the disability management leader for Owens Corning was tasked with getting a medical canvass to review Fuller's past medical records.[133] After reviewing all of the medical records, she did not find anything revealing a preexisting condition.[134] She relayed this to plant leadership including Williamson and DeValerio.[135]

**M. Fuller provided additional doctor's notes.**

On November 2, 2020, Fuller provided a letter from his primary care physician who explained that that he believed that, while the hernia did not begin on the day of the reported injury, the actions of lifting a 150-pound paper roll while bending exacerbated a prior umbilical hernia.[136]

**N.  Owens Corning terminated Fuller for falsifying an incident report.**

On November 5, 2020, after 24 years of loyal service, Owens Corning terminated Fuller's employment for falsifying an incident report.[137] Fuller did not falsify his injury report.[138]

---

[130] Fuller Dec. ¶ 26, (App. 0006).
[131] Fuller Dec. ¶ 26, (App. 0006).
[132] Fuller Dec. ¶ 26, (App. 0006); 2020 paystubs, (App. 0163-214).
[133] Cavinee Depo., p. 32-39, 41-42, (App. 0135-145).
[134] Cavinee Depo., p. 43-44, (App. 0146-0147).
[135] Cavinee Depo., p. 45, (App. 0148).
[136] Fuller Dec. ¶ 28, (App. 0007).
[137] Fuller Dec. ¶ 29, (App. 0007).
[138] Fuller Dec. ¶ 29, (App. 0007).

After the meeting in July 2020 with Williamson and Oliver, no one at Owens Corning contacted Fuller to ask any questions about his injury or any alleged conflicting statements other than nurses who were trying to obtain his medical records.[139]   No one talked with any of his physicians to clear up any perceived discrepancies prior terminating his employment.[140]

## O.  Owens Corning has expressed a negative attitude towards workplace injuries.

During Fuller's employment with Owens Corning, he experienced and witnessed several instances where Owens Corning employees expressed a negative attitude about employees who were injured on the job.  For example, Fuller experienced a workplace injury in 2014 where he was pushed up against a conveyor and got a lumbar sprain which required him to be off work for a few days.[141] Fuller saw the plant nurse at the time who accused Fuller of lying about how the injury happened.[142] This was not the first time Fuller had heard the nurse accuse an employee of lying about how their injury occurred.[143] Luckily, there were witnesses who could attest to what happened to him on that day.[144]

On another occasion, Fuller saw Owens Corning negative treatment when another employee reported a workplace injury.[145] On the day of the accident, Fuller saw the prior to the accident.[146] He seemed normal and did not appear to have any injuries.[147]  Fuller saw him later in the day, after the injury, and saw that his shoulder was hurting him.[148]  Fuller asked him what happened, and he told Fuller that he fell at work.[149]  Williamson was involved with investigating

---

[139] Fuller Dec. ¶ 29, (App. 0007).
[140] Fuller Dec. ¶ 28, (App. 0007).
[141] Fuller Dec. ¶ 30, (App. 0007).
[142] Fuller Dec. ¶ 30, (App. 0007).
[143] Fuller Dec. ¶ 30, (App. 0007).
[144] Fuller Dec. ¶ 30, (App. 0007).
[145] Fuller Dec. ¶ 30, (App. 0007).
[146] Fuller Dec. ¶ 31, (App. 0008).
[147] Fuller Dec. ¶ 31, (App. 0008).
[148] Fuller Dec. ¶ 31, (App. 0008).
[149] Fuller Dec. ¶ 31, (App. 0008).

this workplace injury.[150] Fuller was asked to provide a statement saying that this employee's injury did not occur at work and was a false claim.[151]  Fuller stated that he could not do that because when Fuller saw him at the beginning of the day, the employee was fine and did not appear to be injured.[152] Fuller later found out, and Williamson confirmed, that Owens Corning terminated this employee for making a false injury report.[153]

Fuller is not the only one who has witnessed Owens Corning's negative treatment towards workplace injuries. Plant nurse Goodson, who had only been with Owens Corning for approximately one year, testified about the numerous ways Owens Corning's safety team and human resources office had negative reaction to a workplace injuries:

- Her medical opinion that employees seek medical attention was overturned many times by safety and HR;

- DeValerio and Ortinez would tell employees to go home, take ibuprofen, elevate the extremity and see how they feel the next day rather than seeking medical attention;

- At least three employees expressed to her that they were afraid to report workplace injuries at Owens Corning;

- Ortinez asked Goodson for HIPAA protected medical records because he wanted to find something that proves there was a preexisting condition (with Fuller and several other employees). Goodson refused and was verbally reprimanded by Ortinez;[154]

**P. Owens Corning incentivizes reducing the number of workplace injuries and boasts on its website that it has reduced the number of reportable injuries by 90% since 2002.**

Owens Corning is required to report certain injuries to OSHA.[155] Owens Corning has an initiative to have "zero workplace injuries"[156] Furthermore, Owens Corning boasts on its website

---

[150] Fuller Dec. ¶ 31, (App. 0008).
[151] Fuller Dec. ¶ 31, (App. 0008).
[152] Fuller Dec. ¶ 31, (App. 0008).
[153] Fuller Dec. ¶ 31, (App. 0008); Williamson Depo., 180-181, (App. 0080-0081).
[154] Goodson Depo., p. 16-25, 29-32, 34-35, (App. 0102-0111,0115-0121).
[155] Williamson Depo., p. 33-34 (App. 0038-0039).
[156] Williamson Depo., p. 33, (App. 0038).

that since 2002, it has decreased the number of **reportable** injuries by 90%.[157] In an effort to meet this lofty goal, Owens Corning provides employees with incentives for reducing the number of reportable workplace injuries.[158] For example, in order to be promoted, employees need to have to low number of workplace injuries.[159] Numerous employees and members of the union have reported to Owens Corning's plant nurse and human resources that they are afraid to report workplace injuries because they fear retaliation.[160]

### Q. Fuller appealed the denial of his workers' compensation claim.

After his termination, Fuller appealed the denial of his workers compensation claim and attended a hearing.[161] Although Fuller provided the note from Dr. Linquist stating that he believed the hernia was exacerbated by lifting the 150-pound stub roll, the administrative law judge determined that the evidence submitted was not persuasive in establishing that the hernia was enhanced, accelerated, or worsened and denied Fuller's claim.[162]  There was no finding by the ALJ that Fuller made any false injury report.[163] That was not at issue in that hearing.[164]  The ALJ did not make any findings as to whether Fuller was wrongfully terminated or discriminated against by Owens Corning.[165] Again, that was not at issue in that hearing.[166]

---

[157] Williamson Depo., p. 34-35, (App. 0039-0036).
[158] Williamson Depo., p. 49, (App. 0049).
[159] Goodson Depo., p. 27-28, (App. 0113-0114).
[160] Goodson Depo., p. 28-29, (App. 0114-0115); Oliver Depo., p. 61-62(App. 0154-155).
[161] Fuller Dec. ¶ 31, (App. 0008).
[162] Fuller Dec. ¶ 32, (App. 0008).
[163] Fuller Dec. ¶ 32, (App. 0008).
[164] Fuller Dec. ¶ 32, (App. 0008).
[165] Fuller Dec. ¶ 32, (App. 0008).
[166] Fuller Dec. ¶ 32, (App. 0008).

## II.        ARGUMENTS & AUTHORITIES

### A.        Owens Corning violated the ADA and the TCHRA.[167]

The Americans with Disabilities Act ("ADA") is "designed to remove barriers which prevent qualified individuals with disabilities from enjoying employment opportunities available to persons without disabilities."[168]  The ADA "seeks to eliminate unwarranted discrimination against disabled individuals in order both to guarantee those individuals equal opportunity and to provide the Nation with the benefit of their consequently increased productivity."[169]

#### 1.  Disability discrimination.

To prove a claim for disability-based discrimination,[170] a plaintiff must show that: (1) he is qualified for his position; (2) he has a disability; and (3) he was discriminated against because of his disability.[171]  A plaintiff may present "direct evidence that [he] was discriminated against because of [his] disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)."[172]

Under *McDonnell Douglas*, a plaintiff must establish: (1) he has a disability, or was regarded as disabled; (2) he was qualified for the job; and (3) he was subject to an adverse employment decision on account of his disability, or his disability was a motivating factor in an employment decision.[173]  "If he makes that showing, a presumption of discrimination arises, and

---

[167] Because the TCHRA was enacted in part to provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments, courts look to relevant federal law for guidance. *San Antonio Water System v. Nicholas*, 461 S.W.3d 131,137–38 (Tex. 2015).

[168] *Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999).

[169] *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 801 (1999).

[170] Fuller's claims under the Texas Labor Code are based on the Texas Commission on Human Rights Act (TCHRA). "Because TCHRA 'parallels the language of the [ADA]', Texas courts follow ADA law in evaluating TCHRA discrimination claims. E.g., *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285–87 (5th Cir. 2004). (5th Cir. 2018).

[171] *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007); *Picard v. St. Tammany Parish Hospital*, 611 F.Supp. 2d 608 (E.D. La. 2009).

[172] *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 764 (5th Cir. 2016).

[173] *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 764 (5th Cir. 2016).

the employer must 'articulate a legitimate non-discriminatory reason for the adverse employment action.'"[174] The burden then shifts back to the plaintiff "to produce evidence from which a jury could conclude that the employer's articulated reason is pretextual."[175] "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence."[176] "In the context of a summary judgment proceeding, the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext."[177]   "[A] plaintiff need only bring evidence that enables the jury to disbelieve that the employer's proffered justification motivated the adverse employment action."[178]

The Fifth Circuit has defined adverse employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassigning with significantly different responsibilities, or a decision causing a significant change in benefits."[179] Fuller argues the following were adverse employment actions: 1) placing fuller on unpaid leave prior to his surgery; 2) placing fuller on paid leave after his surgery; and 3) Fuller's termination.

"Being placed on unpaid leave necessarily affected Plaintiff's compensation, and is, therefore, an adverse employment action . . . ."[180]   The Fifth Circuit has held that a transfer or reassignment can be the equivalent of a demotion, and thus constitute an adverse employment action in a discrimination case.[181] "[T]o be the equivalent to a demotion, a transfer need not result

---

[174] *Cannon v. Jacobs Field Servs. N. Am., Inc*., 813 F.3d 586, 590 (5th Cir. 2016) (quoting *EEOC v. Chevron Phillips Chem. Co*., 570 F.3d 606, 615 (5th Cir. 2009)).
[175] *Id.*
[176] *Jackson v. Cal-W. Packaging Corp.,* 602 F.3d 374, 378–79 (5th Cir. 2010).
[177] *Thornbrough*, 760 F.2d at 646.
[178] *Laxton v. Gap Inc.*, 333 F.3d 572, 580 n.2 (5th Cir. 2003)
[179] Fifth Circuit Pattern Jury Charge, 11.8, FN 5, 11.2 *citing Vance v. Ball State Univ*., 570 U.S. 421, 431–32 (2013).
[180] *Garcia v. Garland Indep. Sch. Dist.*, CIV. A. 3:11-CV-0502-N-BK, 2012 WL 4341811, at *4 (N.D. Tex. Aug. 29, 2012).
[181] *Thompson v. City of Waco*, 764 F.3d 500, 503–504 (5th Cir. 2014); see *Alvarado*, 492 F.3d at 612–15.

in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement."[182] Similarly, the Seventh Circuit has found that where a manager or supervisor reduces an employee's long-term career prospects "by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy, and his career is likely to be stunted."[183]

Here, Fuller has presented direct evidence that Fuller was placed on unpaid leave ***because of his disability***. Prior to his injury and hernia diagnoses, Fuller was earning an average of $1500 a week. Following his injury and hernia diagnoses, Fuller's short-term disability benefits only paid $670.95 a week, resulting in a substantial pay cut. As discussed in the accommodation section below, there were other jobs Fuller could have done, but Owens Corning failed to consider those and place him on "medical leave". Similarly, after Fuller's surgery to repair his hernia, he was not allowed to return to work and was placed on a paid administrative leave for four additional months. Because he was not able to work all of his overtime hours as he had done in the past, his pay was significantly reduced..

Finally, Fuller's termination is an adverse employment action because of his disability. Although Fuller's hernia had been repaired at the time of his termination, the termination was

---

[182] *Id.* at 613 (quoting *Sharp v. City of Hous.*, 164 F.3d 923, 933 (5th Cir. 1999)); *Pegram*, 361 F.3d at 283 ("[A]n employment transfer may qualify as an adverse employment action if the change makes the job objectively worse." (internal quotation marks omitted)); *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 770 (5th Cir. 2001) ("A job transfer that includes a shift change that involves changes in duties or compensation or can be objectively characterized as a demotion may be an 'adverse employment action' . . . ."); see, e.g., *Sharp*, 164 F.3d 933 ("The jury could have viewed transferring from the elite Mounted Patrol to a teaching post at the Police Academy to be, objectively, a demotion."); *Forsyth v. City of Dall.,* 91 F.3d 769, 774 (5th Cir. 1996) (recognizing as demotions the reassignment of two police officers from the Intelligence Unit to night patrol because the Intelligence Unit positions "were more prestigious, had better working hours, and were more interesting than night patrol" and "few officers voluntarily transferred from the Intelligence Unit to night patrol and other officers had been so transferred as punishment"); *Click v. Copeland,* 970 F.2d 106, 110 (5th Cir. 1992).
[183] *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002).

merely an extension of the adverse employment action of placing him on unpaid and paid leave because of his hernia. In light of Fuller's prior medical history, FMLA leaves, and the timeline of events, the Court should find that Fuller met his *prima facie* burden, just as it did in *Busken.*[184]

Owens Corning's alleged, non-discriminatory reason for placing Fuller on unpaid leave following his injury and hernia diagnosis is that it could not accommodate his restrictions. However, Fuller has presented evidence that this is false because: light duty jobs had been provided in the past, Nurse Goodson indicated that light duty work was available, and Owens Corning failed to engage in the interactive process.

Owens Corning's alleged, non-discriminatory reason for placing Fuller on a paid leave of absence after he was released to return to work without restrictions is that it was continuing with its "investigation." Owens Corning had from April 8, 2020 to July 20, 2020 to investigate Fuller's injury and could not come up with anything to justify a termination. Fuller provided overwhelming evidence to Owens Corning that he felt pain for the first time on April 8, 2020, that he had a bulge that had never hurt him before, and that he had actually had a double hernia. Owens Corning's team even confirmed there was no prior diagnosis or treatment for a hernia. This was not enough. This was a completely flawed investigation that was not to determine the "root cause" of his injury.

Owens Corning's "investigation" was patently flawed. It failed to seek advice from medical professionals about whether Fuller's report of the injury was consistent with the pain levels he described; it twisted Fuller's words to fit its fabricated story; it disregarded Fuller's explanation of what occurred; and it failed to clarify any perceived discrepancies with Fuller or his medical providers.[185] For example, Williamson testified that the straw that broke the camel's back was a

---

[184] *Busken v. City of Greenville, Texas*, No. 3:19-CV-02808-X [Doc. 32] at p. 7-10 (N.D. Tex. Nov. 3, 2021) (Judge Brantley Starr).
[185] *See Laxton v. Gap Inc.*, 333 F.3d 572, 580 n.2 (5th Cir. 2003) ("[A] plaintiff need only bring evidence that enables the jury to disbelieve that the employer's proffered justification truly motivated the adverse employment action."

doctor's note that stated Fuller's "symptoms did not start at work," but no one at Owens Corning contacted Fuller or his medical provider to determine which symptoms that statement as referring to.[186] Fuller had already told Williamson and Oliver that he had a bulge prior to this injury during their meeting in July 2020. It is unclear how this medical record was the straw that broke the camel's back in November 2020. Based on the foregoing, Owens Corning's Motion for Summary Judgment should be denied.

### 2.  Failure to accommodate.

In addition to prohibiting discrimination based on a person's disabilities, real or perceived, the ADA imposes on employers the duty to make reasonable accommodations to individuals with disabilities if those accommodations will enable the individual to perform the essential functions of his or her job.[187]  In a failure-to-accommodate claim under the ADA, a plaintiff must prove that: (1) he is a "qualified individual with a disability;" (2) the disability and its consequential limitations were "known" by the covered employer; and (3) the employer failed to make "reasonable accommodations" for such known limitations.

A reasonable accommodation may include job restructuring, part-time or modified work schedules, reassignment to a vacant position, and other similar accommodations for individuals with disabilities.[188]  Once an individual has made such a request, the ADA and its implementing regulations require that the parties engage in an "interactive process" to determine what precise

---

(citing *Reeves*, 530 U.S. at 147)); *id.* at 581 (reversing district court's grant of summary judgment to employer in part because the employer did not "discuss" issues with the employee and "never gave her the chance to explain her conduct or improve it" before firing her); *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1159 (10th Cir. 2008); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 407 (7th Cir. 2007) (defendant's failure to get the plaintiff's side of the story when it investigated the plaintiff's alleged misconduct was evidence of pretext); *Tisdale v. Federal Exp. Corp.*, 415 F.3d 516, 529-30 (6th Cir. 2005) (defendant's failure to speak to important witnesses and collect relevant evidence in investigation of misconduct was evidence of pretext)
[186] Williamson Depo., p. 159-161, (App. 0077-0079).
[187] 42 U.S.C. § 12111(9).
[188] *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 622 (5th Cir. 2000) (quoting 42 U.S.C. § 12111(9)).

accommodations are necessary.[189] "When an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA."[190]

Rather than engage in the interactive process and accommodate Fuller's restrictions in April 2020, Owens Corning simply put Fuller on a leave of absence. To be clear, this was not a "paid leave of absence;" this was an unpaid leave of absence for which Fuller utilized his short-term disability benefits to be paid, resulting in a substantial pay decrease.

An employer cannot force an employee to take leave *instead* of providing accommodations that would enable the employee to work.[191] Accommodations under the ADA and TCHRA are intended to keep an individual on the job.[192] Paid leave is considered a lesser form of reasonable accommodation when an employee can be effectively accommodated to continue working.[193]

This Court recently denied a motion for summary judgment on an accommodation claim in *Busken.* There, the Court held there were genuine disputes of material fact on whether a request for modified duty assignment was a reasonable accommodation.[194] This was based on the plaintiff's testimony that modified duty had been granted in the past and the lack of evidence that the defendant engaged in the interactive process.   Here, Fuller testified that light duty accommodations had been granted for other employees with hurt backs or broken arms, Nurse

---

[189] *See* 29 C.F.R. § 1630.2(o)(3), Part 1630 App. § 1630.9.
[190] *Loulseged,* 178 F.3d at 736; *see also Cutrera,* 429 F.3d at 113 (employer may not stymie process by terminating employee before an accommodation can be considered); *Rizzo v. Children's World Learning Ctrs., Inc.,* 213 F.3d 209, 213 & n. 5 (5th Cir.2000) (en banc) (employer must not obstruct process and must make effort to communicate with employee and provide accommodations based on available information); *Loulseged,* 178 F.3d at 737–39 (each party must engage in the process); *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 317–18 (3d Cir.1999) (employer has duty to seek specific information to enable it to make accommodations); *Beck v. Univ. of Wisc. Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996) (failure to communicate indicates bad faith).
[191] *See* Leave, *Job Accommodation Network, https://askjan.org/topics/leave.cfm* (last visited November 7, 2022).
[192] *Id.*
[193] *Id.*
[194] *Id.* at 9.

Goodson's paperwork submitted to Nova Medical indicates that "light duty work is available," and there is no evidence that Owens Corning engaged in the requisite interactive process to determine if Fuller could return to work with his restrictions. Because Owens Corning failed to provide an effective accommodation that would allow Fuller to continue to work, Owens Corning has violated the ADA and TCHRA, and its Motion for Summary Judgment should be denied.

**B.     Owens Corning violated the FMLA.**

**1.   Interference FMLA claim.**

For an FMLA interference claim, "the Court merely looks to see whether the statutory requirements are satisfied and the employee is due the benefit that was denied to him – regardless of employer intent.[195] The FMLA provides that an eligible employee who takes FMLA shall be restored to the position of employment held when the leave commenced or restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.[196] It is undisputed that Fuller was *never* placed back into his position as a machine operator after his FMLA leave ended in July 2020. As described above, Fuller was not able to work all of his overtime hours, which substantially reduced his pay.

Furthermore, courts have recognized that an employer's supposed restoration of the employee following FMLA leave, and subsequent termination of that employee will be considered an "illusory" restoration, giving rise to a cause of action for unlawful termination under the FMLA's interference clause.[197]   Finally, placing Fuller on a leave of absence rather than restoring him to his machine operator position can be seen as a "manipulation by a covered employer to

---

[195] *Busken*, No. 3:19-CV-02808-X at 11, *citing Nero v. Indus. Molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999).
[196] 29 U.S.C. § 2614.
[197] *See Campbell v. Gambro Healthcare, Inc.,* 478 F.3d 1282, 1288 (10th Cir.2007); *Stephens v. Neighborhood Serv. Org.*, 07-11908, 2008 WL 3913926 (E.D. Mich. Aug. 19, 2008).

avoid responsibilities under the FMLA."[198]   This precludes summary judgment on Fuller's interference claim.

### 2. Retaliation FMLA claims.

To succeed on a retaliation claim under the FMLA, Fuller must first demonstrate a *prima facie* case exists by showing that: "(1) [he] engaged in a protected activity, (2) the employer discharged [him], and (3) there is a causal link between the protected activity and the discharge."[199] If Fuller carries his *prima facie* burden, the burden of proof shifts back to Owens Corning to provide a legitimate, non-discriminatory reason for firing Fuller.[200] If Owens Corning's reason does that, the burden shifts back to Fuller, who "must offer sufficient evidence to create a genuine [dispute] of fact either that (a) [Owens Corning's] proffered reason is a pretext for discrimination, or . . . (b) that [Owens Corning's] reason, although true, is but one of the reasons for its conduct, another of which was discrimination."[201]Owens Corning argues that Fuller cannot succeed on his FMLA retaliation claims because he cannot establish the requisite causal connection between his FMLA leave and any adverse employment action by Owens Corning. This argument fails.

An adverse employment action under the FMLA is defined as an action that one might dissuade a reasonable worker from requesting or taking FMLA leave.[202] Here, Owens Corning 1) failed to place Fuller back to his machine operator position after his FMLA ended, which substantially decreased his pay, and 2) eventually terminated his employment.

The causal link is easily seen from the timeline of events – Fuller reported his injury that required surgery and the need for protected time off under the FMLA, Fuller was released to return

---

[198] 29 C.F.R. § 825.220.
[199] *Busken*, No. 3:19-CV-02808-X at 13-14, *citing Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005).
[200] *Id.*
[201] *Id.*
[202] *McArdle v. Dell Products, LP* 293 Fed.Appx. 331, 334–335 (5th Cir. 2008).

to work without restrictions in July 2020, Owens Corning refused to allow Fuller to return to work after his FMLA leave ended, and Owens Corning terminated his employment.[203]

Owens Corning provided its same legitimate, non-discriminatory reason – that it terminated him for making a false injury report. Fuller will not belabor all of the reasons why this reason is merely pretext. Fuller incorporates by reference all of his pretext arguments raised above including the incredibly flawed "investigation" into Fuller's injury report. As such, Owens Corning's Motion for Summary Judgment should be denied.

**C.    Owens Corning violated the Texas Workers Compensation Act ("TWCA").**

The TWCA prohibits an employer from discharging or otherwise discriminating against an employee because that employee 1) filed a workers' compensation claim in good faith, 2) hired a lawyer to represent him in a workers' compensation claim, 3) instituted a workers' compensation proceeding in good faith, or 4) testified (or is about to testify) in a workers' compensation proceeding.[204] Notifying an employer of an on-the-job injury is sufficient to invoke statutory protection against retaliatory discharge.[205]

Texas employs a burden-shifting analysis for workers' compensation retaliatory discharge claims under section 451.001.[206] As part of his *prima facie* case, an employee alleging retaliation bears the initial burden of establishing a causal link between the termination and the filing of a claim for workers' compensation benefits.[207] The plaintiff does not need to show that his workers'

---

[203] *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) ("Close timing between an employee's protected activity and an adverse action against him may provide the causal connection required to make out a prima facie case of retaliation."

[204] TEX. LABOR CODE § 451.001.

[205] *Duhon v. Bone & Joint Physical Therapy Clinics*, 947 S.W.2d 316, 318 (Tex. App. – Beaumont 1997); *Chhim v. Univ. of Houston*, 76 S.W.3d 210, 217-218 (Tex. App – Texarkana 2002) (telephone calls indicating on-the-job injury and copies of medical notices indicating her injury was sufficient to initiate worker's compensation proceeding and invoke protection of § 451.001.).

[206] *Parker v. Valerus Compression Servs., LP*, 365 S.W.3d 61, 66 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

[207] *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450-51 (Tex. 1996); *Wal-Mart Stores, Inc. v. Amos*, 79 S.W.3d 178, 184 (Tex. App.—Texarkana 2002, no pet.).

compensation claim was the sole reason for the employer's action.[208] Instead, the plaintiff must show that but for the filing of his compensation claim, his termination would not have occurred when it did.[209] Once the employee establishes a *prima facie* case, the burden shifts to the employer to rebut the alleged discrimination by showing that there was a legitimate reason for the employee's termination.[210] Finally, if the employer demonstrates a legitimate, nondiscriminatory reason, then the burden shifts back to the employee either to present evidence raising a fact issue on whether the reason for termination was a pretext for the discrimination or to challenge the employer's summary judgment evidence as failing to prove as a matter of law that the reason given was a legitimate, nondiscriminatory reason.[211]

In a § 451.001 case, causation may be established either by direct evidence, or by circumstantial evidence, and by the reasonable inferences which can be drawn from such evidence.[212]  The existence of a "causal link" is determined on a case by case basis.[213] Circumstantial evidence sufficient to establish a causal connection between termination and filing a workers' compensation claim may include 1) knowledge of the claim by those making the termination decision; 2) expression of a negative attitude towards the employee's injured condition; 3) a failure to adhere to established company policies; 4) discriminatory treatment in comparison to similarly situated employees; and 5) evidence that the stated reason for the discharge was false.[214] In addition, temporal proximity between filing a workers' compensation

---

[208] *Continental Coffee Prods.,* 937 S.W.2d at 450.
[209] *Id.*
[210] *Id.*
[211] *Johnson v. City of Houston*, 203 S.W.3d 7, 12 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *Benners v. Blanks Color Imaging, Inc.,* 133 S.W.3d 364, 369 (Tex. App.—Dallas 2004, no pet.).
[212] *Investment Properties Management v. Montes*, 821 S.W.2d 691, 694 (Tex. App. -El Paso 1991, no writ), *citing Paragon Hotel Corp. v. Ramirez*, 783 S.W.2d 654, 658 (Tex. App. -El Paso 1989, writ denied).
[213] *Investment Properties Management v. Montes*, 821 S.W.2d at 694.
[214] *Cazarez*, 937 S.W.2d at 451.

claim and termination may be evidence of a causal connection.[215] Furthermore, the list of factors is merely illustrative and there is no authority requiring evidence be presented on every factor in order to establish the requisite causal connection.[216]

Here, Fuller has overwhelming evidence to establish the causal connection between his injury report and the subsequent adverse employment actions including his termination. Fuller has presented evidence of knowledge of the claim by those making the termination decision, clear evidence of several employees' negative attitude towards Fuller's injury (and other employee's injury reports), and close timing between his injury report and the action of placing him on paid leave "pending investigation" and his termination. Owens Corning alleges that it terminated Fuller's employment because he "falsified an injury report." But as further detailed below, Fuller has presented ample evidence of pretext.

In *McCoy-Winston v. UPS, Inc.*, the court found the plaintiff had presented sufficient evidence that the employer's proffered reason of "proven dishonesty" was pretext.[217] First, the court noted that "though UPS claims its investigation was primarily focused on determining the root cause of Plaintiff's injury, it is clear from the record and from the nature of the investigation conducted that UPS officials had additional considerations in mind."[218]  The court further found that, "UPS sought out reasons to conclude that 'proven dishonesty' occurred rather than merely seek out to uncover any potential safety threats after Plaintiff's injury.[219] Finally, the court acknowledged evidence that the employer incentivized reduction of workplace injuries and the employer's motivation to keep workplace injuries to a minimum.[220]

---

[215] *Green v. Lowe's Home Centers, Inc.*, 199 S.W.3d 514, 522-523 (Tex. App. – Houston [1st Dist.], 2000).
[216] *City of Univ. Park v. Van Doren*, 65 S.W.3d 240, 250 (Tex. App. – Dallas 2001, pet. denied).
[217] *McCoy-Winston v. UPS, Inc.*, No. C20-799-MLP, 2022 WL 782575 at *7 (March 15, 2022 W.D. Wash).
[218] *Id.*
[219] *Id.*
[220] *Id. at *8.

All of this is present in the instant case.  Fuller has presented evidence of Owens Corning's flawed investigation and that Owens Corning sought out reasons to conclude that "proven dishonesty" occurred. Owens Corning disregarded Fuller's statements and the statements from his medical professionals. Owens Corning failed to ask questions or seek clarification for any perceived discrepancies. Instead, it discharged a loyal 24-year employee like a piece of trash.  As such Fuller has presented sufficient evidence for a reasonable juror to conclude that Owens Corning's stated reason was pretext and the Motion for Summary Judgment.

**D.      Owens Corning's collateral estoppel argument is a red herring.**

Owens Corning makes a legally unsupportable argument that *all* of Fuller's claims are precluded by collateral estoppel.  That is not correct.  Collateral estoppel applies only when four conditions are met: (1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine.[221]

As one treatise points out, "[c]ourts have readily perceived that for purposes of preclusion, '[i]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same.'"[222] The Fifth Circuit agrees. "Collateral estoppel does not preclude litigation of an issue unless both the facts and the legal standard used to assess them are the same in both proceedings."[223]

The Fifth Circuit's ruling in *Bradberry v. Jefferson County*, 732 F.3d 540 (5th Cir. 2013) is instructive. There, the employee received a favorable ALJ ruling that his termination was due

---

[221] *Copeland v. Merrill Lynch & Co., Inc.,* 47 F.3d 1415, 1421 (5th Cir.1995).
[222] 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4417, at 165 (footnote omitted).
[223] *Copela nd.,* 47 F.3d at 1422.

29

"disagreements about his military leave."[224] The employee attempted to preclude relitigating this issue in his USERRA claim of wrongful termination.[225] The Fifth Circuit said no and held that a finding that the employee was discharged due to a disagreement about military service was not the equivalent of a finding that the county was motivated by his military status to discharge him.[226] The Court refused to apply collateral estoppel to the ALJ's finding because "the issue of motivation remains an unresolved fact question."[227]

Here, the sole issue at the ALJ hearing was whether Fuller suffered a compensable injury while at work. It was not whether Owens Corning discriminated against him because of his disability or failed to accommodate his disability. It was not whether Owens Corning interfered with or retaliated against Fuller under the FMLA. It was not whether Fuller reported a workplace injury in good faith or whether Fuller falsified his injury report.  Because of these issues are not identical to the issues presented at the ALJ hearing, the court should disregard this nonsensical and legally unsupported argument and deny Owens Corning's Motion for Summary Judgment.

## III.   CONCLUSION & PRAYER

In the summary judgment context, all reasonable inferences must be drawn in Fuller's favor. Therefore, Plaintiff Johnny Fuller requests that Owens Corning's Motion for Summary Judgment be DENIED.

---

[224] *Id.* at 550
[225] *Id.*
[226] *Id.*
[227] *Id.*

Respectfully submitted by:

*/s/ Megan Dixon*
**Megan Dixon**
State Bar No. 24079901
mdixon@clousebrown.com

**CLOUSE BROWN, PLLC**
1201 Elm St., Ste. 5250
Dallas, Texas 75270
Tel:  (214) 698-5100
Fax:  (214) 481-8881

**ATTORNEY FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

On this the 13th day of December, 2022, counsel for Plaintiff electronically filed the foregoing document with the Clerk of Court of the U.S. District Court, Northern District of Texas, Dallas Division, via Electronic Case Filing Systems of the Court.  The Electronic Case Filing System sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept service of this document by electronic means as follows.

/s/ Megan Dixon
Megan Dixon

31